UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| BRIAN LOFGREN, | |
| Plaintiff, | Case No. 2:13-cv-13622 |
| | Honorable Laurie J. Michelson |
| v. | |
| AIRTRONA CANADA and SAM BARBERIO, | |
| Defendants. | |

## FINDINGS OF FACTS AND CONCLUSIONS OF LAW

In 2009, Plaintiff Brian Lofgren purchased equipment from non-party AirTrona Green Technologies through Defendant Sam Barberio. In 2011, Lofgren purchased upgraded equipment from Defendant AirTrona Canada, again through Barberio. These purchases allowed Lofgren to first operate a vehicle-deodorizing business and then a vehicle-deodorizing-and-sanitization business. Lofgren did so under the name AirTrona. More specifically, from late 2009 to early 2013, an employee of Lofgren's would drive a van, marked in AirTrona logos and equipped with an ozone generator, to car dealerships and then deodorize or sanitize the vehicles for a fee. By early 2013, after losing money each year, Lofgren decided to stop operating his AirTrona business. He attempted to sell his business or equipment to AirTrona Canada, but the two could not reach an agreement.

So Lofgren filed this lawsuit. The primary relief he seeks is to unwind his transactions with the AirTrona entities and be put back in the financial situation he was in prior to 2009. He says he is allowed to do this because both the 2009 and 2011 purchases were "franchise" agreements under the Michigan Franchise Investment Law ("MFIL") and Barberio and AirTrona

Canada violated provisions of the MFIL that trigger rescission. After withdrawal of its initial counsel, AirTrona Canada did not defend this lawsuit (indeed, it may be out of business now) and it has been defaulted. But Barberio has contested Lofgren's claim that there were franchise agreements and that rescission is a proper remedy.

In October 2015, this Court held a bench trial. The evidence introduced at trial served to complicate the resolution of the parties' dispute rather than simplify it. In particular, neither party introduced adequate evidence for the Court to determine AirTrona Green Technologies' legal relationship with AirTrona Canada. Moreover, although the Court was previously aware that there were no written contracts between any of the entities (Lofgren, Barberio, or the AirTronas), it became further apparent that the businesses were informally run—essentially a group of friends helping each other out. Moreover, due to the informal business structure of AirTrona Canada, Barberio's role with the company was not well defined.

Nonetheless, the Court now resolves the parties' dispute. *See* Fed. R. Civ. P. 52(a)(1) ("In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court."). Although the Court agrees with Barberio that AirTrona Canada's violations of the Michigan Franchise Investment Law did not cause Lofgren's business to fail, Lofgren is nonetheless entitled to rescission. Barberio and AirTrona Canada will thus be adjudged jointly and severally liable to Lofgren in the amount of $82,757.85 (U.S.).[1]

---

[1] Unless otherwise indicated, all dollar figures refer to Canadian dollars.

# I.

## A.

Lofgren first met Barberio at a self-development seminar during the summer of 2009. (Barberio Dep. at 16–17.)  By all accounts, the two later became good friends. (*See* Barberio Dep. at 16–17; Def.'s Ex. 1, June 21, 2011 Email from Lofgren to Barberio.) Indeed, at times, they would refer to each other as "brothers." (*See* Def.'s Ex. 1, May 4, 2010 Email from Lofgren to Barberio.)

Not long after the seminar, Barberio shared a business opportunity with Lofgren: using ozone to deodorize vehicles at car dealerships. (Dkt. 42, Trial Tr. Vol. I at 15.) After accompanying Barberio to some dealerships to better understand how the service was performed, Lofgren decided to invest $6,000 (U.S.) into a Canadian company known as AirTrona Green Technologies. (*See* Trial Tr. Vol. I at 18–19; Barberio Dep. at 63–66.) AirTrona Green Technologies, which is not a party to this lawsuit, was founded by Darrell Hubert and then gifted to Barberio's now ex-wife, Sheri D'Intino. (Barberio Dep. at 67–68.) D'Intino also served as AirTrona Green Technologies' president. (Barberio Dep. at 68; SB Ex. 16 at 000132.)

According to Lofgren, soon after he made this investment, Barberio "started pushing the opportunity to own a franchise" in the United States. (Trial Tr. Vol. I at 20.) Barberio agreed that he presented Lofgren the opportunity to do business with AirTrona, but testified that the idea was for Lofgren to run AirTrona's United States operations, not to operate an AirTrona franchise. (Barberio Dep. at 17–18, 41, 125–26.)

In either event, Lofgren decided to start an AirTrona-branded business in Michigan. To do so, Lofgren paid AirTrona Green Technologies $25,000 in September 2009. (SB Ex. 1 at Pg ID 197.) In exchange for this payment, AirTrona Green Technologies provided Lofgren with,

3

among other things, an ozone generator and related equipment, a van wrapped in AirTrona logos, uniforms, business cards, and brochures. (*See* Pl.'s Ex. 30, Nov. 21, 2009 Invoice.) Lofgren also formed O3 Clean, LLC d/b/a/ AirTrona to run his deodorizing business. (Def.'s Ex. 2, O3 Clean LLC Filing Endorsement.) As Lofgren's job as a pilot kept him away from Michigan about two weeks per month, Lofgren hired Jim Raasch to drive the van to car dealerships and deodorize vehicles. (Trial Tr. Vol. I at 7, 22.)

In 2009 and 2010, Lofgren's AirTrona business lost money as costs (primarily comprised of payroll) exceeded revenue. (Def.'s Ex. 8, Profit & Loss Stmts.) The parties dispute the cause of the poor performance of Lofgren's business during these years: Lofgren testified that it was due to the economy generally and a slowdown in business during Michigan's winters, while Barberio testified that it was because Lofgren did not find the right sales people. (*See* Trial Tr. Vol. II at 19–20, 30, 36; Barberio Dep. at 49–50.) Ken Dehon, who operates a successful AirTrona business in Florida, testified that Lofgren needed to be more hands on in operating his business ("you can't do this from the cockpit of an airplane"); Dehon explained that he would personally "walk the lots" to identify cars that needed ozone service. (Dehon Dep. at 22–23, 26, 38–39, 64–65; *see also* Trial Tr. Vol. II at 17–19.)

**B.**

Defendant AirTrona Canada was formed in January 2010 and began doing business at least by October 2010. (SB Ex. 1 at Pg ID 197, Cmts. to Compl. by Jim Cairns; SB Ex. 16, Oct. 14, 2010 Email from Cairns to AirTrona Personnel.) The parties did not develop the record as to AirTrona Canada's legal relationship with non-party AirTrona Green Technologies. The evidence that was introduced at trial is mixed.

4

In some ways, the companies are separate corporate entities. (*See* Barberio Dep. at 140 (providing that AirTrona Green Technologies and AirTrona Canada were "two different companies . . . two different identities").) AirTrona Canada began doing business sometime in 2010, at which point it appears that AirTrona Green Technologies had stopped operating. (*See* Barberio Dep. at 96.) Further, based on a review of email communications, D'Intino, AirTrona Green Technologies' president and owner, was not involved with AirTrona Canada. (*See* SB Exs. 5–7, 16.) Instead, Jim Cairns founded AirTrona Canada and served as AirTrona Canada's president. (SB Ex. 16 at 000131, Oct. 14, 2010 Email from Cairns to AirTrona Personnel; Barberio Dep. at 14.) AirTrona Canada's business was also broader than AirTrona Green Technologies: it intended to sanitize vehicles and not just deodorize them. As Barberio testified, "So one of the problems [with the ozone only process] is we had to basically remove the source [of the smell]. So if the source is still in the car, such as a bad smoke smell, well the ozone doesn't remove it. You have to extract it out, and we didn't find that out until about a couple of years later when we brought some new team players into the business, and they helped us with that problem." (Barberio Dep. at 10.)

In other ways, the evidence indicates significant overlap between the two companies. For example, Barberio was significantly involved with both companies. (*See* Barberio Dep. at 15, 23–24, 95, 104, 120; Trial Tr. Vol. I at 15–16, 35, 37–38; Dehon Dep. at 49; SB Exs. 16, 22, 26.) And before becoming president of AirTrona Canada, it appears that Cairns operated a van for AirTrona Green Technologies. (*See* Barberio Dep. at 85; Trial Tr. Vol. I at 52–53.) And AirTrona Canada, at least for a time, used invoices stamped with an AirTrona Green Technologies' logo. (Pl.'s Exs. 31–34.) Moreover, when AirTrona Canada began operation, nothing suggests that it required Lofgren to enter into an agreement so that Lofgren could

5

continue to operate his AirTrona business, including driving his AirTrona-marked van and handing out AirTrona brochures.

## C.

Despite financial losses in 2009, 2010, and the first half of 2011, Lofgren continued to operate his AirTrona business.

In the summer of 2011, Barberio, now on behalf of AirTrona Canada, presented Lofgren with an opportunity to expand his business. Under the expansion, Lofgren would be provided upgraded equipment capable of not only deodorizing vehicles but also sanitizing them. (Trial Tr. Vol. I at 43; Trial Tr. Vol. II at 31; Barberio Dep. at 10.) The upgrade would thus allow Lofgren to service all vehicles at a dealership, whether they required deodorization or not. (Trial Tr. Vol. II at 31.) In connection with the upgrade, Barberio promised Lofgren that he would secure three "full line automobile dealerships for Lofgren," i.e., customers that would agree to have all their vehicles serviced. (Barberio Dep. at 43–44; Trial. Tr. Vol. II at 60–61, 64.) Barberio also told Lofgren that, with the upgraded franchise, he would earn profits of $3,000 to $5,000 per month. (Barberio Dep. at 51–53.)

Relying on Barberio's promise of three full-line dealerships, Lofgren agreed to purchase, in his words, an "upgraded franchise model" from AirTrona Canada. (Trial Tr. Vol. I at 62; Trial Tr. Vol. II at 40, 60.)

On July 28, 2011, AirTrona Canada sent Lofgren's company an invoice. (Pl.'s Ex. 31.) The invoice, marked with an AirTrona Green Technologies logo, identified Cairns and Barberio as the sales people and provided that for $35,000, O3 Clean LLC would receive "1 Franchise Michigan Location." (*See* Pl.'s Ex. 31, July 28, 2011 Invoice; SB Ex. 12, Lofgren's Stmt. of Losses.)

6

On August 4, 2011, AirTrona Canada sent Lofgren a second invoice (again marked with an AirTrona Green Technologies' logo). (Pl.'s Ex. 32, Aug. 4, 2011 Invoice.) This one was for $28,148 and included a list of items: two ozone generators, an air compressor, a gas generator, a carpet extractor, "AirTrona trademark vehicle wrapping," and an accessory kit. (Pl.'s Ex. 32.) The bottom of the invoice stated: "Direct All Inquiries To: Sam Barberio" and to "Make Cheques Payable To: AirTrona Canada." (Pl.'s Ex. 32.)

Although two ozone generators were listed on the August 2011 invoice, in fact, AirTrona Canada and Lofgren "structured the upgrade of the franchise" by having Lofgren pay $15,000 directly to the generator manufacturer, Simpson Environmental. (SB Ex. 12, Lofgren's Stmt. of Losses ("$15,000 . . . paid to Simpson Environmental on behalf of AirTrona Canada as part of payment to franchise upgrade"); Trial Tr. Vol. II at 11 (noting that AirTrona Canada was in "arrearage").) Similarly, Lofgren did not purchase the van needed for the upgrade from AirTrona Canada. (*See* Lofgren's Stmt. of Losses; Trial Tr. Vol. I at 65, 67.) But, on August 17, 2011, Lofgren did wire $20,000 directly to AirTrona Canada. (Lofgren's Stmt. of Losses.) Lofgren also provided AirTrona Canada with his old van and generator "for a discount on the purchase price" of the upgrade. (Trial Tr. Vol. I at 62.) Lofgren values the old van and generator at $5,000 (U.S.). (Pl.'s Ex. 39; Trial Tr. Vol. I at 72.)

**D.**

The upgraded franchise did not perform as well as Lofgren had hoped. Lofgren testified that this was because Barberio failed to follow through on the promises he made in connection with the upgrade. In particular, Lofgren testified that Barberio did not secure three full-line dealerships and that the business model for the upgraded franchise was "based on full line dealerships." (Trial Tr. Vol. II at 40, 41–43.) Lofgren also testified that Barberio did not provide

the sales training necessary to successfully run the upgraded franchise. (Trial Tr. Vol. II at 27, 32–34.) Barberio testified that he did secure three full-line dealerships for Lofgren and that the profit projections he made were conservative estimates—Lofgren should have done even better. (Barberio Dep. at 44, 53, 90–91, 93.) In all events, Lofgren's costs (again primarily payroll) exceeded his revenue in both 2011 and 2012. (*See* Def.'s Ex. 8, Profit & Loss Stmts.) When asked why he did not reduce his payroll, Lofgren testified that it was necessary to employ two people to perform the sanitization process. (Trial Tr. Vol. II at 38–39.)

By early 2013, Lofgren wanted to close his AirTrona business. In March 2013, he and Dehon (the owner of the AirTrona business in Florida) discussed the possibility of Dehon purchasing Lofgren's business or equipment. (*See* Def.'s Ex. 1, March 14, 2013 Emails between Lofgren and Dehon.) Lofgren also engaged in similar negotiations with AirTrona Canada through Barberio. (SB Ex. 11, March 2013 Emails between Lofgren and Barberio.) At one point, Barberio and Lofgren seemed to reach an agreement where AirTrona Canada would give Lofgren $30,000 for Lofgren's van and equipment and $10,000 because Lofgren paid for two ozone generators but received only one. (*See id.*)

Ultimately, however, negotiations over the purchase of Lofgren's business or equipment broke down. (*See* KD Ex. 2; Barberio Dep. at 34–35.) On June 19, 2013, Lofgren's then-counsel sent a letter to Cairns claiming that AirTrona "International" (the name of Dehon's AirTrona business) had violated several provisions of the Michigan Franchise Investment Law and thus owed Lofgren over $125,000 (U.S.). (Pl.'s Ex. 38.) A copy of the letter was also sent to Dehon. (Pl.'s Ex. 38; *see also* KD Exs. 3, 4.)

8

**E.**

About two months later, in August 2013, Lofgren filed this lawsuit against AirTrona Canada and Barberio. (*See* Dkt. 1, Compl.) Lofgren's Complaint sets out four counts against the two Defendants: (1) violations of §§ 7a and 8 of the Michigan Franchise Investment Law, (2) a violation of § 23 of the MFIL, (3) common law fraud, and (4) breach of contract. (*See generally* Compl.)

A default was entered against AirTrona Canada on October 7, 2014. (Dkt. 23.) But the Court has not entered a default judgment against AirTrona Canada because Lofgren claims that Barberio and AirTrona Canada are jointly and severally liable and because, if successful, certain of Barberio's defenses would also show that AirTrona Canada is not liable. (*See generally* Dkt. 31, Order Regarding Mot. for Protective Order.)

From October 27 through October 30, 2015 this Court held a bench trial.

**II.**

The Court first sets forth its conclusions of law regarding Lofgren's claims under §§ 7a, 8, and 23 of the Michigan Franchise Investment Law. It then turns to Lofgren's claims of fraud and breach of contract.

**A.**

Lofgren claims that there are two franchises at issue in this case—one in 2009 based on the initial purchase of AirTrona equipment and one in 2011 based on the purchase of upgraded AirTrona equipment. Assuming for the sake of argument that the 2009 transaction amounted to a "franchise" under the Michigan Franchise Investment Law, Lofgren has not shown that AirTrona Canada or Barberio are liable under the MFIL for their conduct relating to that transaction.

9

Lofgren rightfully concedes that he cannot recover against AirTrona Canada for the 2009 transaction under the MFIL. (Dkt. 41, Pl.'s FF ¶¶ 87–89.) As found above, when Lofgren purchased equipment and a van to begin his AirTrona business, AirTrona Canada was not yet in existence. Lofgren's 2009 purchase was from AirTrona Green Technologies. And, as also discussed, AirTrona Green Technologies' legal relationship with AirTrona Canada is unclear. For example, there is nothing in the record that suggests AirTrona Canada bought the stock, acquired the assets, and/or assumed the liabilities of AirTrona Green Technologies. As such, the Court finds that the evidence does not show, more likely than not, that AirTrona Canada is a successor to AirTrona Green Technologies for purposes of the 2009 franchise agreement (if any).

Lofgren nonetheless claims that he can recover against Barberio for the 2009 transaction under § 32 of the MFIL. (Pl.'s FF ¶¶ 76–77, 89; Dkt. 41, Pl.'s COL ¶¶ 16–17.) That section reads,

> A person who directly or indirectly controls a person liable under this act, a partner in a firm so liable, a principal executive officer or director of a corporation so liable, a person occupying a similar status or performing similar functions, an employee of a person so liable who materially aids in the act or transaction constituting the violation, is also liable jointly and severally with and to the same extent as the person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist.

Mich. Comp. Laws § 445.1532. Lofgren's position is that because Barberio was principally responsible for the 2009 transaction, he is liable under § 32 at least because he is "an employee of a person so liable who materially aids in the act or transaction constituting the violation." (Pl.'s COL ¶ 18.) The Court disagrees.

According to the plain language of § 32, to hold Barberio liable, it must be that he controlled a person "liable" under the MFIL, that he was similar to a principal of a corporation "so liable," or was an employee of a person "so liable." *See* Mich. Comp. Laws § 445.1532. But

10

the Court has no basis to deem AirTrona Green Technologies liable as it has not been sued. And it would be unfair, to both Barberio and AirTrona Green Technologies, to find a non-party liable where the legal relationship between it and the defendants is unclear and it did not have the opportunity to defend against the claims. *See Hansberry v. Lee*, 311 U.S. 32, 40, 61 S. Ct. 115, 117, 85 L. Ed. 22 (1940) ("It is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process.").

Accordingly, the Court concludes that neither AirTrona Canada nor Barberio are liable under the Michigan Franchise Investment Law for selling Lofgren equipment in 2009.

**B.**

The analysis regarding the 2011 transaction is more involved. The parties dispute whether the 2011 sale of equipment was a "franchise" as that term is used in the Michigan Franchise Investment Law. The parties further dispute which sections of the MFIL were violated, and whether Barberio (as opposed to just AirTrona Canada) can be held liable for those violations. The parties also disagree on the appropriate remedy under the MFIL, if any. The Court addresses these issues in turn.

**1.**

Barberio asserts the 2011 transaction did not amount to a "franchise" as that term is used in the Michigan Franchise Investment Law. Under the MFIL, a "franchise" is

> a contract or agreement, either express or implied, whether oral or written, between 2 or more persons to which *all* of the following apply:

> (a) A franchisee *is granted* the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor.

(b) A franchisee *is granted* the right to engage in the business of offering, selling, or distributing goods or services substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate.

(c) The franchisee is *required* to pay, directly or indirectly, a *franchise fee*.

Mich. Comp. Laws § 445.1502(3) (emphases added). Barberio argues that the 2011 equipment purchase did not fall within this definition because (1) that agreement did not "grant[]" Lofgren the right to use the AirTrona trademark and marketing plan (i.e., Lofgren had already been granted that right) (Dkt. 43, Trial Tr. Vol. IV at 31, 33–35, 40), (2) Lofgren was not "required" to pay AirTrona Canada anything in 2011 (Dkt. 40, Def.'s FFCOL ¶ 136), and (3) even if Lofgren was required to pay AirTrona Canada something in 2011, Lofgren was not required to pay a "franchise fee" (Def.'s FFCOL ¶¶ 132–34, 137–40).

None of these arguments are availing. As an initial matter, Barberio's claim that the 2011 sale of goods did not "grant[]" Lofgren the right to use AirTrona Canada's trademark and marketing plan because Lofgren had already been granted those rights overlooks the fact that when Lofgren began operating his AirTrona business in 2009, it was AirTrona Green Technologies—not AirTrona Canada—that granted Lofgren the right to use an AirTrona mark and an AirTrona marketing plan.

Of course, this does not entirely dispose of Barberio's "is granted" argument. This is because Lofgren continued to operate his AirTrona business after AirTrona Canada's founding in 2010. Moreover, the record shows that Lofgren was working with AirTrona Canada, as opposed to AirTrona Green Technologies, by at least late 2010 (which was well before the mid-to-late-2011 upgrade). (*See* SB Ex. 16 at 000131, Oct. 14, 2010 Email from Cairns to AirTrona Personnel; SB Ex. 16 at 000129, Nov. 8, 2010 Email from Lofgren to Barberio re Weekly Earnings.) Thus, an argument could be made that in providing upgraded equipment to Lofgren in

12

2011, AirTrona Canada did not "grant[]" Lofgren the right to use its marks or marketing plan—it had already done so in late 2010 or early 2011.

But to the extent that Barberio claims that the definition of "franchise" as provided for by the MFIL is limited to *new* grants of the right to use a mark or operate under the franchisor's marketing plan, the Court finds the claim unsupportable. An example illustrates why. Suppose a franchisor and franchisee decide to substitute a modified agreement for their existing franchise agreement. And suppose that under the substituted agreement, the franchisor again grants the right to use its marks and marketing plan but does so on the condition of a higher franchise fee. If the Court were to interpret "is granted" as not including this substituted agreement (because the franchisor is simply re-granting rights), the substitution would fall outside of the definition of a "franchise" and thus not be covered by the MFIL. Yet, the MFIL is intended to cover the substitution. This is made plain by the fact that § 6(e) of the MFIL makes the disclosure requirements of § 8 inapplicable to the "substitution of a modified or amended franchise agreement" where there is no interruption in the franchisee's business *and* "no material change in the franchise relationship." Mich. Comp. Laws § 445.1506(e); *see also* Mich. Admin. Code R. 445.101(9) (providing that a higher franchise fee is a "material change"). In other words, if this Court were to exclude from the definition of "franchise" agreements which re-grant the right to use a mark or operate under the franchisor's marketing plan, it would mean that substituted franchise agreements with material changes would be exempt from the MFIL. And this would render the narrower exemption of § 6(e) (because it also requires "no material change in the franchise relationship") of the MFIL superfluous. Statutory constructions that render entire statutory provisions meaningless are rarely, if ever, correct. *See Altman v. Meridian Twp.*, 487 N.W.2d 155, 160 (Mich. 1992) ("Every word of a statute should be given meaning and no word

13

should be treated as surplusage or rendered nugatory if at all possible." (internal quotation marks omitted)).

Additionally, there is no record evidence that AirTrona Canada had granted these rights to Lofgren prior to the 2011 invoice for the "franchise." Just because Lofgren continued to use the AirTrona name, for example, does not establish it was pursuant to an AirTrona Canada grant. It is just as likely he was using the AirTrona name pursuant to a grant from AirTrona Green Technologies or at his own peril. Indeed, the 2011 invoice sent by AirTrona Canada for the upgraded equipment included a new charge for "AirTrona trademark vehicle wrapping," Thus, the Court concludes that even if AirTrona Canada had "granted" Lofgren the right to use its marks and marketing plan prior to 2011 upgrade, this fact would not preclude a new grant or the 2011 upgrade from falling within the definition of "franchise" in the MFIL.

Barberio's assertion that Lofgren was not "required" to pay a franchise fee within the meaning of § 32 fares no better. It is true that AirTrona Canada did not require Lofgren to take the upgrade: Lofgren testified that he "would not have taken the upgrade" if not for Barberio's promise of three dealerships and that "Dehon did not take the upgrade." (Trial Tr. Vol. II at 25, 60.) Both statements indicate choice. But the problem with Barberio's argument is that the definition of "franchise" in the MFIL does not concern itself with whether entering into the contract was optional or required, but only whether—under the contract—the franchisee "is required to pay . . . a franchise fee." *See* Mich. Comp. Laws § 445.1502(3). And here, while Lofgren was not required to purchase upgraded equipment in 2011, once he decided to do so, the parties' agreement "required" Lofgren to pay AirTrona Canada for that equipment. Indeed, as found above, AirTrona Canada invoiced Lofgren expressly for "1 Franchise Michigan Location" and Lofgren paid $20,000 directly to AirTrona Canada.

14

The foregoing also shows that Barberio's reliance on *Kenaya Wireless, Inc. v. SSMJ, L.L.C.*, No. 281649, 2009 WL 763496 (Mich. Ct. App. Mar. 24, 2009), is misplaced. (*See* Def.'s FFCOL ¶¶ 136.) There, the plaintiffs had entered into an agreement with the defendant to be an authorized distributor of wireless phones (and other similar products). *See id.* at *1. The plaintiffs claimed that the parties' agreement was a "franchise" within the meaning of the MFIL and the key dispute was whether the plaintiffs were required to pay a franchise fee. *See id.* The court rejected the plaintiffs' claim that "their monthly payments to defendant for marketing and internet technology (IT) services constituted a franchise fee." *See id.* at *2. In so doing, the court explained, "the agreement does not impose any requirements on the retailer to purchase marketing or IT services" and "[t]here is no evidence to suggest that plaintiffs were forced to purchase the services from defendant in order to enter into the agreement." *Id.* Just the contrary is true here: at the very heart of the 2011 upgrade was an agreement that Lofgren would pay AirTrona Canada in exchange for new equipment. Unlike the plaintiffs in *Kenaya Wireless*, Lofgren is not claiming a franchise fee based on items he had the option to purchase under the parties' agreement.

Barberio also claims that even if the 2011 agreement required Lofgren to pay AirTrona Canada, the 2011 agreement was not a "franchise" because Lofgren's payment was not a "franchise fee." (Def.'s FFCOL ¶¶ 137–40.) The MFIL defines "franchise fee" as "a fee or charge that a franchisee . . . is required to pay or agrees to pay for the right to enter into a business under a franchise agreement, including but not limited to payments for goods and services." Mich. Comp. Laws § 445.1503(1). Again, Lofgren had to purchase the upgraded equipment to enter into the sanitization business. The Michigan Administrative Code fleshes out the definition of a "franchise fee" by explaining that "[a] payment made directly or indirectly by

the franchisee to or for the benefit of the franchisor in excess of the bona fide wholesale price constitutes a franchise fee" and by defining the phrase "bona fide wholesale price" as "a price which constitutes a fair payment for goods purchased at a comparable level of distribution." Mich. Admin. Code R. 445.101(6); *see also* Mich. Comp. Laws § 445.1503(1)(a). Barberio asserts that Lofgren introduced no "admissible evidence regarding the 'price which constitutes a fair payment for goods purchased at a comparable level of distribution . . .' for either the van or [ozone] generator." (Def.'s FFCOL ¶ 139.)

But even if Barberio is correct about the lack of evidence pertaining to the bona fide wholesale price of the van and the ozone generators specifically, Lofgren has produced evidence that, in total, he paid AirTrona Canada more than the bona fide wholesale price for the goods he received in connection with the 2011 upgrade. The August 4, 2011 invoice that AirTrona Canada sent Lofgren indicates that the total price of the goods Lofgren received in connection with the upgrade—two ozone generators, an air compressor, a gas generator, a carpet extractor, "AirTrona trademark vehicle wrapping," and an accessory kit—was $28,148. (Pl.'s Ex. 32.) That invoice also provides that the price for the two ozone generators was $20,000. Lofgren paid Simpson Environmental $15,000 toward the cost of the ozone generators and thus, under AirTrona Canada's pricing, still owed AirTrona Canada $5,000 for the generators. The invoice provides that AirTrona Canada priced the items other than the two generators at $8,148. Thus, if Lofgren paid AirTrona the prices it demanded for the goods it sent to Lofgren in connection with the upgrade, he should have paid only $13,148 ($5,000 more for the generators plus $8,148 for the other equipment). But the evidence demonstrates that Lofgren wired $20,000 directly to AirTrona Canada on August 17, 2011 for the $35,000 franchise fee referenced on the invoice. Thus Lofgren paid AirTrona Canada more than price of the goods he received—under AirTrona

16

Canada's own pricing. And, despite Barberio's vague testimony that starting Lofgren's business "cost more money than [AirTrona Canada] received" (Barberio Dep. at 21–23), the Court finds that, more likely than not, the prices on AirTrona Canada's August 2011 invoice are at or above bona fide wholesale prices for the same goods. *See* Mich. Admin. Code R. 445.101(6) ("In a determination as to whether the price of goods arising from a marketing plan or system of a manufacturer, licensor, or a franchisor is a bona fide wholesale price, relevant cost, marketing, *pricing*, or *payment information*, among other factors, may be considered." (emphasis added)).

An October 2011 customs invoice associated with the delivery of the equipment that Lofgren purchased further supports the conclusion that Lofgren paid above the bona fide wholesale price for the goods he received in connection with the upgrade. The customs invoice indicates that AirTrona Canada valued the air compressor, the gas generator, the carpet extractor, and a host of other accessories (e.g., window foam, chamois, floor plastic, enzyme solution) at only $5,646. (SB Ex. 23.) Adding the costs to wrap the van with AirTrona Canada's trademark (AirTrona Canada priced that at $2,000 (Pl.'s Ex. 32)), and assuming in AirTrona Canada's favor that the ozone generators were $10,000 each (as opposed to the $1,500 figure listed on the customs invoice), it remains that Lofgren paid $35,000 for goods valued at only $27,646.

The Court thus concludes that, more likely than not, Lofgren made a payment to AirTrona Canada for goods "in excess of the [goods'] bona fide wholesale price." *See* Mich. Admin. Code R. 445.101(6). As such, Lofgren paid a "franchise fee" in 2011 for the right to upgrade the equipment and participate in a business that could now provide sanitizing services in addition to deodorizing.

Barberio's arguments aside, it is still Lofgren's burden to demonstrate that, more likely than not, his 2011 equipment purchase from AirTrona Canada meets the three requirements for a

17

"franchise" under Michigan Compiled Laws § 445.1502(3). As an initial matter, although each of the three statutory requirements must be satisfied, it is noteworthy that the parties involved thought that Lofgren was purchasing a franchise: the July 2011 invoice that AirTrona Canada sent to Lofgren explicitly stated "1 Franchise Michigan Location." *Cf. Jerome-Duncan, Inc. v. Auto-By-Tel, L.L.C.*, 989 F. Supp. 838, 842 (E.D. Mich. 1997) *aff'd*, 176 F.3d 904 (6th Cir. 1999) ("Before turning to an examination of the language of the MFIL which sets out the requirements for a franchise agreement, this court notes two general considerations. First, the word 'franchise' does not appear anywhere in the parties' agreement. While not dispositive, it is clearly probative of what type of agreement was reached.").

As for the three statutory requirements, the evidence introduced at trial indicates that in connection with the 2011 upgrade, AirTrona Canada wrapped a van that Lofgren purchased in AirTrona's marks thereby granting Lofgren the right to use those marks. *See* Mich. Comp. Laws § 445.1502(3)(b). And, as discussed, Lofgren paid a franchise fee under the 2011 agreement. *See* Mich. Comp. Laws § 445.1502(3)(c).

Regarding the remaining of the three requirements, whether AirTrona Canada granted Lofgren the right to operate under a marketing plan or system that AirTrona Canada prescribed, *see* Mich. Comp. Laws § 445.1502(3)(a), the evidence Lofgren cites in support is unpersuasive. Lofgren relies upon a document titled "Rules for franchisee." (Pl.'s FF ¶ 66.d.) But this document is undated and the most Lofgren could say was that he "most likely" received it "some time in 2010." (*See* SB Ex. 3, Rules for Franchisee; Trial Tr. Vol. I at 49.) And it is unclear whether AirTrona Canada was even doing business before late 2010. More problematic is that these are the same franchise Rules that Lofgren cites to support that he was granted a franchise by AirTrona Green Technologies in 2009 and Lofgren concedes that AirTrona Green

18

Technologies and AirTrona Canada are separate companies. (Pl.'s FF ¶¶ 35.d; 89.) And attributing the Rules to AirTrona Green Technologies makes more sense given when Lofgren received the rules (i.e., before the 2011 upgrade) and that these Rules make no mention of the sanitizing business (which was AirTrona Canada's business). Lofgren also relies on an email from "Alex Hark" providing that franchise agreements "will be completed within the next week" and that a "franchise handbook" was in also the works. (Pl.'s FF ¶ 66.d; SB Ex. 5.) But this email was sent in April 2010, and so the Court again cannot say, more likely than not, that Hark sent the email on behalf of AirTrona Canada as opposed to AirTrona Green Technologies.

Still, Lofgren presented other evidence that preponderates in favor of finding that AirTrona Canada granted Lofgren the right to operate under a marketing plan or system prescribed by AirTrona Canada. The Michigan Administrative Code provides,

> The presence of any of [the following four] factors, among others, indicates that a marketing plan or system is prescribed in substantial part by the franchisor: . . . Representations by . . . the franchisor that the franchisor aid or assist the franchisee in training or in obtaining locations or facilities for operation of the franchisee's business, or in marketing the franchisor's product or service.

Mich. Admin. Code R. 445.101(4)(c)(iv). To this end, AirTrona Canada provided Lofgren the technical training necessary to run the upgraded sanitization business. (Trial Tr. Vol. II at 33.) Further, Barberio promised Lofgren training in sales techniques and three dealerships agreeable to having all their cars serviced by Lofgren. (Trial Tr. Vol. II at 31–32, 33–34.) And, at one point, AirTrona Canada asked for Lofgren's dealer list of customers so that it could send promotional materials to those customers. (SB Ex. 16 at 000131, Oct. 14, 2010 Email from Cairns to AirTrona Personnel.)

In addition, the Court finds that, to some extent, Lofgren's business was dictated and monitored by AirTrona Canada. In the same email requesting Lofgren's list of customers, Cairns

19

also provided that the customer list would "give us [AirTrona Canada] a good idea of the total volume of dealers being serviced in each territory." (Oct. 14, 2010 Email from Cairns to AirTrona Personnel.) Lofgren was also required to report weekly sales figures to AirTrona Canada. (SB Ex. 16 at 000129, Nov. 8, 2010 Email from Lofgren to Barberio.) Further, the pricing on the sanitization services that Lofgren provided were prescribed, or at least suggested, by AirTrona Canada. (Pl.'s Ex. 34 (providing that "Full Line Sanitization Dealer Base Price" was $149.95).) Lofgren also invoiced his customers on forms supplied AirTrona Canada. (Pl.'s Ex. 34.) And he had to pay $2,000 for van trademark wrapping in order to advertise the business.

Thus, although the evidence does not strongly demonstrate that AirTrona Canada granted Lofgren the right to operate under a marketing plan or system that it prescribed, in all, it favors that finding.

In sum, the Court finds that AirTrona Canada's sale of upgraded equipment to Lofgren in 2011 to expand the business services, referenced in the invoice as a sale of a "franchise," amounts to a "franchise" as that term is used in the Michigan Franchise Investment Law. *See* Mich. Comp. Laws § 445.1502(3).

**2.**

Given that the 2011 transaction was a "franchise" under the Michigan Franchise Investment Law, the issue becomes whether AirTrona Canada and Barberio violated the three provisions of the MFIL asserted in the Complaint: §§ 7a, 8, and 23.[2]

---

[2] In the Joint Final Pretrial Order entered in this case, Lofgren also asserts that AirTrona Canada and Barberio violated § 5 of the MFIL. (*See* Dkt. 39, Joint Final Pretrial Order at 4.) Not only was § 5 not asserted in earlier joint proposed final pretrial orders submitted to the Court, Lofgren did not assert this section of the MFIL in his Complaint and does not assert it in his proposed findings of fact and conclusions of law. Accordingly, the Court finds that Lofgren has not properly raised a claim under § 5 of the MFIL and will not consider that section in its analysis.

Section 7a requires a franchisor to file an annual notice with the Michigan Department of Attorney General "[p]rior to offering for sale or selling a franchise" in Michigan. *See* Mich. Comp. Laws §§ 445.1507a. Although the evidence indicates that AirTrona Canada did not file such a notice, Barberio claims that Lofgren was not damaged by this failure. (*See* Def.'s FFCOL ¶¶ 149–50.)

The Court agrees. Section 31 limits liability for a violation of § 7a to "damages caused by the noncompliance." Mich. Comp. Laws § 445.1531. Lofgren produced no evidence indicating that he was damaged by AirTrona Canada's failure to file the annual notice under § 7a. Indeed, Lofgren admitted that he suffered no such damages:

> THE COURT: And from not having the notice, did you suffer any actual damages?
>
> THE WITNESS: Well, other than business losses, no.
>
> THE COURT: You suffered business losses from not receiving that notice[?]
>
> THE WITNESS: No, not directly no.

(Trial Tr. Vol. II at 69.) As such, the Court concludes that, more likely than not, AirTrona Canada's failure to comply with § 7a of the MFIL did not cause Lofgren harm. It follows that neither AirTrona Canada nor Barberio is liable to Lofgren under § 31 for violating § 7a.

The Court reaches a similar conclusion regarding § 23. The MFIL does not provide a civil cause of action for every failure to comply with it terms. It states, "Except as explicitly provided in this act, civil liability in favor of any private party shall not arise against a person by implication from or as a result of the violation of a provision of this act or a rule or order hereunder." Mich. Comp. Laws § 445.1534. Notably, § 445.1531 creates civil liability in favor of franchisees only for violations of §§ 5, 7a, and 8. Absent is § 23. And for good reason: § 23 prohibits making a material false statement (or omission) in a notice or report filed with the

21

Michigan Department of Attorney General—not in a notice or report provided to the franchisee—and the MFIL gives the Department the right to enforce its provisions. *See* Mich. Comp. Laws §§ 445.1535–445.1538. Accordingly, the Court finds that even if AirTrona Canada violated § 23 of the MFIL, Lofgren cannot recover against AirTrona Canada or Barberio for that violation.

This leaves § 8. That provision of the Michigan Franchise Investment Law prohibits the sale of a franchise "without first providing to the prospective franchisee, at least 10 business days before the execution by the prospective franchisee of any binding franchise or other agreement or at least 10 business days before the receipt of any consideration, whichever occurs first," a certain disclosure statement. *See* Mich. Comp. Laws § 445.1508. It is not disputed, and the evidence presented at trial supports, that Lofgren never received the disclosure statement required by § 8. Indeed, Barberio conceded this point at trial. (Barberio Dep. at 41–42, 107.)

Barberio nonetheless maintains that there was no violation of § 8 because of an exemption under the MFIL. (Def.'s FFCOL ¶ 143.) In particular, § 6 of the MFIL provides, in relevant part, "the offer and sale of a franchise is exempt from [§ 8] if any of the following circumstances apply: . . . There is an extension or renewal of an existing franchise or the exchange or substitution of a modified or amended franchise agreement where there is no interruption in the operation of the franchise business of the franchisee, and no material change in the franchise relationship." Mich. Comp. Laws § 445.1506(1)(e).

The Court finds Barberio's reliance on § 6 misplaced because the 2011 agreement resulted in a "material change in the franchise relationship." As discussed, even assuming that there was a franchise between Lofgren and an AirTrona entity prior to the 2011 upgrade, that agreement was between Lofgren and AirTrona *Green Technologies*. That the 2011 agreement

22

was with a new company, AirTrona Canada, suggests a "material change in the franchise relationship." Additionally, Lofgren's business changed with the 2011 upgrade. The very purpose of the upgrade was to expand into a new line of business, one that involved sanitization and, thus, servicing all the cars on a dealership. Indeed, the sanitization process was different enough from the odor removal process that Lofgren needed to hire another employee and AirTrona Canada saw fit to provide Lofgren with new equipment and additional training. As such, the Court finds that the 2011 agreement resulted in a "material change in the franchise relationship" and § 6 is inapplicable.

In sum, the Court concludes that AirTrona Canada violated § 8 of the Michigan Franchise Investment Law but that Lofgren cannot recover for any violations of §§ 7a and 23 of the MFIL.

### 3.

Having concluded that AirTrona Canada's sale of equipment to Lofgren in 2011 amounted to a "franchise" under the Michigan Franchise Investment Law, and having concluded that Lofgren violated § 8 of the MFIL, the issue becomes Barberio's liability. Lofgren seeks to hold Barberio jointly and severally liable with AirTrona Canada under § 32 of the MFIL. (Pl.'s FF ¶¶ 76–77; Pl.'s COL ¶¶ 16–17.)[3]

Barberio argues that § 32 of the MFIL does not apply to him for two reasons: he is not a responsible party under that section and he falls within that section's safe harbor for individuals who have "no knowledge of or reasonable grounds to believe in the existence of the facts by

---

[3] AirTrona Canada is liable under the MFIL in part because it has not defended this action and was thus defaulted. Notably, if the Court had found no violation of the MFIL, it could not adjudge AirTrona Canada liable (despite its default) given the joint-and-several nature of Lofgren's MFIL claims against Barberio and AirTrona Canada. This issue was discussed at length in a prior opinion. (*See generally* Dkt. 31, Order Regarding Mot. for Protective Order.)

reason of which the liability is alleged to exist." (Def.'s FFCOL ¶¶ 146–47.) The Court disagrees with both assertions.

Barberio is a responsible party under § 32 at least because he is "an employee of [AirTrona Canada] who materially aid[ed] in the act or transaction constituting the violation." *See* Mich. Comp. Laws § 445.1532. It is true that Barberio repeatedly referred to himself as a "consultant" for AirTrona Canada as opposed to an employee of AirTrona Canada. (*See e.g.*, Barberio Dep. at 15, 120.) But ample evidence demonstrates that Barberio was heavily involved in the AirTrona Canada business and, in particular, the 2011 transaction with Lofgren. Although minimizing the designation as both aspirational and arbitrary, Barberio testified that Cairns, the President of AirTrona Canada, had assigned Barberio the designation of CEO/COO. (Barberio Dep. at 23; SB Ex. 16.) Barberio admitted that he performed research and development for the company (Barberio Dep. at 15), that Cairns "would have asked for [his] opinion" about which rules franchisees should follow (*id.* at 118), and that, in making equipment sales for AirTrona Canada, he was responsible for informing Cairns of the customer's business requirements and desired growth and investment (*id.* at 168). Additionally, the evidence indicates that Lofgren was required to report weekly sales figures to Barberio. (*See* SB Ex. 16.) And, when Lofgren attempted to settle his dispute with AirTrona Canada, Barberio acted on behalf of AirTrona Canada in those negotiations. (*See* SB Ex 11.) As for the 2011 transaction with Lofgren, Barberio admitted that it was "his" sale (Barberio Dep. at 167), and, consistent with that testimony, the August 2011 invoice from AirTrona Canada to Lofgren states, "Direct All Inquiries to: Sam Barberio." Moreover, Barberio told Lofgren that he would provide training and help Lofgren launch the business and in fact went to Michigan for that purpose. (Barberio Dep. 28, 37, 48.) Indeed, Lofgren would not have purchased the upgrade but-for Barberio's promises

24

of three full-line dealerships. In all, the Court finds by a preponderance of the evidence that Barberio was "an employee of [AirTrona Canada] who materially aid[ed] in the act or transaction constituting the violation." *See* Mich. Comp. Laws § 445.1532.

And § 32's safe harbor does not apply. The findings in the prior paragraph, coupled with Barberio's testimony that he knew that franchisees were entitled to disclosures and that Lofgren received none (Barberio Dep. at 41–42, 107, 172), suffice to reject Barberio's claim that he did not have "reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist," Mich. Comp. Laws § 445.1532.

In sum, the Court finds that Barberio is jointly and severally liable with AirTrona Canada under § 32 of the Michigan Franchise Investment Law for AirTrona Canada's violation of § 8 of the MFIL.

## 4.

Remaining are the appropriate remedy and the size of that remedy. Section 31 of the Michigan Franchise Investment Law gives franchisees a choice of remedies for a violation of § 8: "damages or rescission." *See* Mich. Comp. Laws § 445.1531(1). Lofgren has elected rescission. (Pl.'s COL ¶ 24.)

Rescission at common law involves unwinding the transaction such that the parties are placed in the position they were in prior to contracting:

> "To rescind a contract is not merely to terminate it, but to abrogate and undo it from the beginning; that is, not merely to release the parties from further obligation to each other in respect to the subject of the contract, but to annul the contract and restore the parties to the relative positions which they would have occupied if no such contract had ever been made. Rescission necessarily involves a repudiation of the contract and a refusal of the moving party to be further bound by it. But this by itself would constitute no more than a breach of the contract or a refusal of performance, while the idea of rescission involves the additional and distinguishing element of a restoration of the status quo."

25

*Wall v. Zynda*, 278 N.W. 66, 68 (Mich. 1938) (quoting Black on Rescission and Cancellation, § 1). The Court finds that the Michigan legislature meant the same thing when it used the term "rescission" in § 31 of the MFIL, especially given that § 31(2) uses the term "rescission offer" to describe the franchisor's offer to "refund the consideration" that the franchisee provided to enter into the franchise. Mich. Comp. Laws § 445.1531(2).

Barberio claims that placing Lofgren in the position he was in prior the 2011 agreement is "not a proper remedy" for four reasons. (*See* Def.'s FFCOL ¶¶ 151–56.) None persuade.

Barberio argues that "[t]here is no connection between any violation of the MFIL and Mr. Lofgren's alleged damages." (Def.'s FFCOL ¶ 149.) The Court agrees. But the problem with this argument is that § 31 does not state that rescission is only available to those franchisees who demonstrate that a § 8 violation caused it damages. It says, "A person who offers or sells a franchise in violation of section 5 or 8 is liable to the person purchasing the franchise for damages or rescission." Mich. Comp. Laws § 445.1531. The omission of a causation requirement for rescission is particularly telling given the same section of the MFIL explicitly sets out a causation requirement for a violation of § 7a. Mich. Comp. Laws § 445.1531. The Court thus reads § 31 of the MFIL to allow a franchisee the remedy of rescission even if the franchisee cannot show it was harmed by the franchisor's violation of § 8.

Barberio next argues that rescission is improper because AirTrona Canada did not substantially breach the parties' franchise agreement and because he made no misrepresentations with an intent to deceive Lofgren. (Def.'s FFCOL ¶ 152.) This argument suffers from the same flaw as the last: the plain language of § 31 does not require a substantial breach or an intent to deceive to invoke the remedy of rescission. As explained, it says that a person who violates § 5 or § 8 "is liable" to the purchaser of the franchise "for damages or rescission."

Barberio also claims that AirTrona Canada's violation of § 8 of the MFIL was merely a "technical" violation and so rescission is improper unless Lofgren demonstrates fraud. (*See* Def.'s FFCOL ¶ 154.) But the violation at issue in this case is materially different than the violation Barberio cites for this proposition of law.

In *Two Men & a Truck/International Inc. v. Two Men & a Truck/Kalamazoo, Inc.*, 949 F. Supp. 500 (W.D. Mich. 1996), the franchisee attempted to invoke rescission for the franchisor's violation of § 8 of the MFIL. In finding that rescission was not a proper remedy, the Court found the following facts significant: (1) while the franchisor failed to comply with § 8's requirement to provide a disclosure statement ten days prior to the signing of the franchise agreement, the franchisor still provided the disclosure seven days before the signing, (2) the franchisees "knew the actual profits that the franchise provided," (3) the franchisees had not "notif[ied] [the franchisor] of their rescission until they had reaped the benefits of the successful franchises for two years," and (4) the franchisees were attempting to rescind the agreement despite that they were in breach of the franchise agreements for failing to pay royalties. *Id.* at 507. On these facts, "rescission was not an available remedy." *Id.*; *see also Two Men & a Truck/Int'l Inc. v. Two Men & a Truck/Kalamazoo, Inc.*, 955 F. Supp. 784, 786 (W.D. Mich. 1997) (denying motion for reconsideration and explaining that because franchisee acted "in bad faith" and continually failed to make royalty payments, the disclosure was only three days late, and the franchisee waited two years to rescind, rescission would be an "egregious, inequitable result" unintended by the Michigan legislature).

The facts of this case are very different. Lofgren was not merely provided a § 8 disclosure late—he was never provided such a disclosure. And, although Barberio provided projections, Lofgren did not know the actual profits that his upgraded franchise would yield.

27

Moreover, there was no showing that Lofgren attempted to rescind the agreement as a way to escape his obligations under the agreement. And Lofgren did not invoke the remedy as late as the franchisees in *Two Men & a Truck*: Lofgren received the upgraded equipment in late 2011 and attempted to rescind at least by March 2013. On the facts of this case, the Court does not find the remedy of rescission to be an "egregious, inequitable result."

Barberio further argues that rescission is not available to Lofgren because the equitable defenses of laches and estoppel bar the remedy. (Def.'s FFCOL ¶ 156.) As to the former defense, Barberio says that Lofgren waited for several years following the 2009 franchise agreement to invoke rescission, which is too late. (*Id.* ¶ 156a.) As to estoppel, Barberio says that Lofgren "induced Defendants to believe that he was happy with and willing to continue to operate his franchise until early 2013." (*Id.* ¶ 156b.)

The problem with Barberio's reliance on laches and equitable estoppel is that both defenses require a showing of prejudice, *Van v. Zahorik*, 597 N.W.2d 15, 22 (Mich. 1999); *Lothian v. City of Detroit*, 324 N.W.2d 9, 14 (Mich. 1982), and, at trial, Barberio proved no prejudice attributable to his reliance or Lofgren's delay. True, the Court can speculate that had Lofgren sought to rescind the franchise agreement in early 2012, as opposed to early 2013, AirTrona Canada and Barberio would be in a better position than if that remedy is granted now. But speculation is not a valid basis for a legal conclusion.

In sum, the Court finds that rescission is a proper remedy for AirTrona Canada's violation of § 8 of the Michigan Franchise Investment Law. *See* Mich. Comp. Laws § 445.1531.

**5.**

This leaves only determining the amount AirTrona Canada and Barberio must pay Lofgren to return Lofgren's financial condition to the state it was in before the 2011 upgrade.

28

Lofgren offers the following calculation to return him to the status quo ante. He says he paid $15,893 (U.S.) to the ozone generator manufacturer, $20,690 (U.S.) to AirTrona Canada, and also gave AirTrona Canada his old van and ozone generator valued at $5,000 (U.S.) in connection with the 2011 upgrade. (*See* Pl.'s Ex. 39; SB Ex. 12.) Thus, Lofgren seeks $41,583 (U.S.) (plus interest since the date of the sale), to place in him in the situation he was in before the upgrade. (*See* Pl.'s Ex. 39.)

The problem with Lofgren's calculation is that it focuses only on *his* circumstances prior to the 2011 agreement. In particular, Lofgren overlooks the equipment AirTrona Canada provided in connection with the upgrade. Based on AirTrona Canada's August 4, 2011 invoice, Lofgren received equipment valued at $18,148 (Lofgren only received one ozone generator instead of the two listed on the invoice). But for the upgrade, Lofgren would not have been the beneficiary of these goods. Stated differently, if the 2011 agreement was rescinded the moment after it was consummated, Lofgren would have returned the ozone generator and other equipment to AirTrona Canada (and/or Simpson Environmental), with a total value of $18,148, and, in exchange, AirTrona Canada (and/or Simpson Environmental) would have returned $35,000, along with the old van and the old generator, to Lofgren. Lofgren has produced no evidence that he has ever returned the ozone generator and other equipment to AirTrona Canada.

Thus, the Court finds that, had the 2011 agreement been immediately rescinded, Lofgren would be entitled to the following amount from AirTrona Canada and/or Barberio: $16,852 (the $35,000 Lofgren paid less the $18,148 in goods he received) plus $5,000 (U.S.). In United States

dollars, $16,852 Canadian is $17,433.39. Adding the $5,000 (U.S.) for the old van and equipment, the total is $22,433.39 (U.S.).[4]

The MFIL additionally provides for interest at "12% per year" from the date of purchase and for "reasonable attorney fees and court costs." Mich. Comp. Laws § 445.1531(1). Regarding interest, using a purchase date of August 17, 2011 (the date Lofgren wired $20,000 to AirTrona Canada) to present (January 4, 2016), AirTrona Canada and Barberio owe Lofgren $36,935.72 (U.S.) for purposes of rescission. Lofgren's counsel claims $45,822.13 (U.S.) in fees. Having considered counsel's rate of $395.00 (U.S.) and the work performed in this case, and given that Barberio has not contested the fee amount as unreasonable, the Court will award Lofgren $45,822.13 (U.S.) in reasonable attorney's fees.

In all, the Court finds that Barberio and AirTrona Canada are jointly and severally liable to Lofgren under the Michigan Franchise Investment Law in an amount of $82,757.85 (U.S.).

## C.

Two counts of the Complaint remain to be adjudicated: fraud and breach of contract. The Court addresses fraud first.

Lofgren argues fraud in a single sentence of his proposed conclusions of law: "Common law fraud (including projections made by an expert) . . . ha[s] also been established as to Barberio." (Pl.'s COL ¶ 25.) The Court disagrees.

As Barberio points out, to succeed on a claim of "actionable fraud," a plaintiff must show by "clear, satisfactory and convincing evidence," *Hi-Way Motor Co. v. International Harvester Co.*, 247 N.W.2d 813, 816 (Mich. 1976), that the defendant made a false, material representation

---

[4] The Court has determined a conversion rate of 1.0345 based on the conversion rate Lofgren used and Barberio did not challenge. (Two of Lofgren's exhibits indicate that $20,000 (Canadian) is equivalent to $20,690 (United States). (SB Ex. 12; Pl.'s Ex. 39.))

and "that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion," *Titan Ins. Co. v. Hyten*, 817 N.W.2d 562, 567 (Mich. 2012) (internal quotation marks omitted). Lofgren produced no evidence at trial showing that when Barberio told Lofgren that he would earn profits of $3,000 to $5,000 per month following the upgrade, Barberio knew that projection to be false. To the contrary, when Barberio was asked, "Did you expect, based on the size of the Detroit market, that [Lofgren] would hit those numbers?" Barberio responded, "Absolutely. Those numbers are low. We always underpromise and overdeliver . . . ." (Barberio Dep. at 53.) The same holds for Barberio's promise to secure three full-line dealerships: even if Barberio failed to fulfill that promise, Lofgren did not produce clear and convincing evidence that Barberio did not intend to keep his promise at the time he made it. Indeed, Lofgren claimed that he would eventually pay a royalty payment to AirTrona Canada, so Barberio stood to benefit from Lofgren's success.

Accordingly, the Court finds that neither AirTrona Canada nor Barberio are liable to Lofgren for fraud.[5]

## D.

Lofgren's conclusory assertion that Barberio is liable for breach of contract also lacks merit. (Pl.'s COL ¶ 25.) Based on Lofgren's counsel's closing argument, the contract at issue is the August 4, 2011 invoice. (Trial Tr. Vol. IV at 24.) But Barberio was not a party to this

---

[5] Despite AirTrona Canada's default, the Court declines to inconsistently find that Barberio is not liable for fraud but AirTrona Canada is liable for fraud when identical conduct underlies the two claims. *See* 10 Moore's Federal Practice & Procedure § 55.36 (3d ed.) ("The [*Frow v. De La Vega*, 82 U.S. 552 (1872)] rule seeks to prevent inconsistent judgments in cases involving joint liability or joint remedies. Some courts have interpreted *Frow* more broadly to apply when defendants are 'similarly situated,' even if not jointly liable. Thus, when defendants are 'similarly situated' judgment should not be entered against a defaulting defendant if the other defendant prevails on the merits. These courts focus on the incongruity of holding one party liable when a court has determined that another party in essentially the same position is not.").

contract. True, the evidence suggests that he helped secure the agreement and may have even had authority to assent on behalf of AirTrona Canada. But that only shows that Barberio made an agreement as an agent of AirTrona Canada. And when, as here, the principal is disclosed, an agent is not considered a party to a contract that he procures on behalf of his principal. *See Riddle v. Lacey & Jones*, 351 N.W.2d 916, 919 (Mich. Ct. App. 1984) ("'Unless otherwise agreed, a person making or purporting to make a contract with another as agent for a disclosed principal does not become a party to the contract.' . . . 'In the absence of other facts, the inference is that the parties have agreed that the principal is, and the agent is not, a party.'" (quoting Restatement (Second) of Agency § 320)); *see also King v. Russell*, 270 N.W. 775, 776 (Mich. 1936).

This leaves Lofgren's claim that AirTrona Canada breached the 2011 agreement by only delivering one ozone generator despite having paid for two. But even if AirTrona Canada is liable for breach of contract due to its default, the Court awards no damages to Lofgren for that breach because the Court's award of rescission fully compensates Lofgren for his payments to AirTrona Canada in connection with the 2011 upgrade. *See Abbo v. Wireless Toyz Franchise, L.L.C.*, No. 304185, 2014 WL 1978185, at *13 (Mich. Ct. App. May 13, 2014) ("This Court has held that a plaintiff may seek rescission and damages for fraud, despite that one requires affirmance of the contract while the other demands disavowal, *as long as the jury picks one theory and does not award double recovery*." (emphasis added) (citing *Jim-Bob, Inc. v. Mehling*, 443 N.W.2d 451, 461 (Mich. Ct. App. 1989))).

### III.

For the reasons given, the Court adjudges Defendants Sam Barberio and AirTrona Canada jointly and severally liable to Brian Lofgren under the Michigan Franchise Investment

Law in the amount of $82,757.85 (U.S.). Neither Barberio nor AirTrona Canada is liable for fraud. Barberio is not liable for breach of contract. And even if AirTrona Canada is liable for breach of contract, Lofgren is not entitled to damages for that breach.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated: January 4, 2016

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on January 4, 2016.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson